******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# MELVIN DELGADO *v.* COMMISSIONER OF CORRECTION
## (AC 45982)

Moll, Clark and Seeley, Js.

*Syllabus*

The petitioner sought relief in a third petition for a writ of habeas corpus, claiming that P, his counsel during his second habeas action, had provided ineffective assistance by failing to raise claims of ineffective assistance against G, the petitioner's criminal trial counsel, and D, his counsel on direct appeal from his conviction. The petitioner had been convicted, after a jury trial, of murder as an accessory as a result of a gang related argument during which he and another individual shot at the unarmed victim as he was attempting to flee. The petitioner gave a statement to the police in which he admitted shooting the victim and claimed that the victim had reached toward the front of his waist as if he were about to pull out a gun. The petitioner did not indicate in the statement that he saw an actual weapon. Having determined that the evidence was lacking to support a defense of self-defense and that the outcome of the trial hinged on the petitioner's statement to the police, G decided not to request a jury instruction on self-defense and instead employed a trial strategy of attacking the credibility of the police involved in the petitioner's arrest and discrediting the statement's reliability while highlighting facts about the petitioner that might appeal to the jurors' sympathy. Thereafter, the court instructed the jury on the charge of murder, a specific intent crime. Although the court initially read the murder statute (§ 53a-54a (a)), which contained language requiring the specific intent to cause the victim's death, it also read the entire statutory (§ 53a-3 (11)) definition of intent, which included language on both specific intent and general intent to engage in conduct. The habeas court rendered judgment denying the petition for a writ of habeas corpus, concluding that the petitioner had not established that either G or D had rendered ineffective assistance, and, thus, that he could not prevail on his ineffective assistance claims against P. The court granted the petitioner's petition for certification to appeal, and the petitioner appealed to this court. *Held*:

1. The petitioner could not prevail on his claim that P rendered ineffective assistance when he failed to raise a claim that G had rendered deficient performance when she declined to request a self-defense instruction at the criminal trial: G's decision was a matter of sound trial strategy, as a defense of self-defense was inconsistent with the evidence that the unarmed victim was shot from behind as he was fleeing, and G was unable to find a witness or other evidence to corroborate the petitioner's belief that the victim was reaching for a weapon at the time of the shooting; moreover, G sought to have the jury consider only secondarily that the petitioner may have acted in self-defense and made the tactical decision to afford the jury two pathways to find the petitioner not guilty of murder without foreclosing the reasonable and well supported strategy of attacking the credibility of his statement to the police, as G's main objective was to discredit the statement in an attempt to persuade the jury to disregard evidence that was key to the state's case while her secondary objective was to suggest that, if the jury were to believe the petitioner's statement, it also might believe that he acted in self-defense when he shot at the victim.

2. The habeas court correctly rejected the petitioner's ineffective assistance claims against P concerning the trial court's jury instruction on the intent element of murder, as the petitioner was not prejudiced by G's failure to object to the instruction, and D did not improperly fail to raise the issue on direct appeal:

a. Although G rendered deficient performance when she failed to object to the intent instruction, the record in its entirety, including the petitioner's incriminating statement to the police and the corroborating physical evidence presented by the state, showed that the petitioner failed to demonstrate a substantial likelihood that the outcome of his criminal

trial would have been different had G objected to the instruction: although the court incorrectly read the entire definition of intent in § 53a-3 (11), it repeatedly referenced the specific intent language when it thereafter instructed the jury on the lesser included offense of manslaughter in the first degree with a firearm and on accessorial liability as it applied to the murder charge and to manslaughter; moreover, the court correctly distinguished the intent elements of manslaughter and accessory to manslaughter from the specific intent language of the murder charge and accessory to murder, and, by stressing and emphasizing the differences between the elements of the offenses under which the petitioner could be found guilty, the court eliminated any risk of confusion that could have been caused by its improper prior instruction on intent to commit murder, and, thus, it was not reasonably possible that the jury was misled by the incorrect instruction on the element of intent.

b. P did not render ineffective assistance by failing to claim that D improperly failed to raise the issue of the incorrect intent instruction on direct appeal, this court having previously determined, on the basis of its review of the merits of the underlying claim, that it was not reasonably probable that the petitioner would have prevailed on direct appeal.

Argued November 14, 2023—officially released March 19, 2024

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Oliver, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Robert L. O'Brien*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellant (petitioner).

*Brett R. Aiello*, assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's attorney, and *Jo Anne Sulik*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

MOLL, J. The petitioner, Melvin Delgado, appeals, following the granting of his petition for certification to appeal, from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly concluded that his criminal trial counsel, Attorney Kimberly Graham, and his appellate counsel, Attorney Theresa M. Dalton, did not render ineffective assistance during the criminal proceedings underlying his conviction or in the direct appeal from his conviction, respectively, a conclusion that necessarily defeated the petitioner's claims of ineffective assistance of counsel directed at his second habeas counsel, Attorney Laljeebhai R. Patel. We disagree and, accordingly, affirm the judgment of the habeas court.

The following facts, as set forth by our Supreme Court in the petitioner's direct appeal from his criminal conviction; see *State* v. *Delgado*, 247 Conn. 616, 725 A.2d 306 (1999); or as undisputed in the record, and procedural history are relevant to our resolution of this appeal. "On the evening of December 20, 1994, the [petitioner], a member of the Los Solidos street gang, was socializing with friends at a party in an apartment in Hartford's Dutch Point housing project (Dutch Point). A fellow Los Solidos gang member, identified only by the nickname 'Cheesecake,' also was present at the party. Late in the evening, the [petitioner], who was carrying a nine millimeter pistol, left the party and went to meet Cheesecake at a nearby store located at 63 Norwich Street. Cheesecake was armed with a .38 caliber revolver.

"Shortly after midnight, while he was walking from Dutch Point to the store, the [petitioner] encountered the victim, Anthony Battle, near the intersection of Stonington and Norwich Streets. The [petitioner] recognized the victim as a member of Twenty Love, a rival gang with which the Los Solidos gang was at war. The [petitioner] approached the victim from the Stonington Street side of the intersection, and the two men engaged in a heated argument. The [petitioner], who at this time was approximately fifteen to twenty feet from the victim, drew his pistol and began firing at the victim. While the [petitioner] was shooting at the victim, Cheesecake, who was standing at the Norwich Street side of the intersection, also opened fire on the victim. The [petitioner] and Cheesecake continued to shoot at the victim as he attempted to flee. After firing thirteen rounds, the [petitioner] watched as the wounded victim climbed a fence and escaped into a nearby park. Thereafter, the [petitioner] and Cheesecake left the scene separately.

"Within minutes, two Hartford police officers arrived at the scene of the shooting and found the victim lying on the ground in intense pain. He had been shot twice,

once in the back of the right leg and once in the back of the right arm. The victim told the officers that he had been shot by members of Los Solidos and that at least one of the shooters was Hispanic. The victim was transported to Hartford Hospital, where he subsequently died from loss of blood caused by his gunshot wounds." Id., 619–20.

The petitioner subsequently was arrested and charged with murder in violation of General Statutes § 53a-54a[1] and with possession of a firearm during the commission of a class A, B or C felony in violation of General Statutes § 53-202k.[2] Following a jury trial, during which the petitioner was represented by Graham, the petitioner was convicted of being an accessory to murder in violation of General Statutes §§ 53a-8[3] and 53a-54a, and of possession of a firearm during the commission of a class A, B or C felony in violation of § 53-202k. See id., 618. The petitioner was sentenced to a total effective sentence of sixty-five years of imprisonment. Id., 634. Thereafter, the petitioner, represented by Dalton, appealed from the judgment of conviction directly to our Supreme Court pursuant to General Statutes (Rev. to 1997) § 51-199 (b). Id., 618 n.3. On direct appeal, our Supreme Court affirmed the judgment of conviction as to the accessory to murder charge but vacated the judgment of conviction with respect to the firearm charge to reflect the fact that § 53-202k does not constitute a separate offense.[4] See id., 634.

In 2004, following the disposition of his direct appeal, the petitioner commenced his first habeas action, in which he was represented by Attorney Robert J. McKay (first habeas counsel). In an amended petition for a writ of habeas corpus dated February 9, 2007, the petitioner asserted, inter alia, that Graham and Dalton had rendered ineffective assistance as criminal trial counsel and appellate counsel on direct appeal, respectively. Following a trial, the habeas court, *Fuger, J.*, denied the amended habeas petition. Upon the habeas court's denial of certification to appeal from the judgment denying his amended habeas petition, the petitioner appealed to this court, which dismissed the appeal. See *Delgado* v. *Commissioner of Correction*, 114 Conn. App. 609, 618, 970 A.2d 792, cert. denied, 292 Conn. 920, 974 A.2d 721 (2009).

In 2009, the petitioner commenced a second habeas action. In an amended petition for a writ of habeas corpus dated March 22, 2011, the petitioner, represented by Patel, asserted that McKay had rendered ineffective assistance as prior habeas counsel. Following a trial, the habeas court, *Bright, J.*, denied the amended habeas petition and the ensuing petition for certification to appeal, whereupon the petitioner, on July 25, 2011, appealed to this court. On March 19, 2014, this court dismissed the appeal. See *Delgado* v. *Commissioner of Correction*, Connecticut Appellate Court, Docket No.

AC 33706 (appeal dismissed March 19, 2014).

Meanwhile, in 2013, during the pendency of the appeal from the judgment rendered in the second habeas action, the petitioner commenced a third habeas action, which underlies the present appeal. In an amended petition for a writ of habeas corpus dated July 10, 2020 (operative petition), the petitioner asserted four counts of ineffective assistance of counsel, of which only counts one, three, and four are relevant to this appeal.[5] In counts one and three, the petitioner alleged that Patel had rendered ineffective assistance by failing to raise claims of ineffective assistance against McKay for failing to assert certain claims that Graham had rendered ineffective assistance during the criminal trial. Specifically, the petitioner alleged that Graham had rendered ineffective assistance because she failed (1) to request a self-defense jury instruction and (2) to object to an erroneous intent instruction articulated by the trial court on the murder charge. In count four, the petitioner alleged that Patel had rendered ineffective assistance by failing to raise the claim that McKay had rendered ineffective assistance when he failed to assert that Dalton had rendered ineffective assistance on direct appeal by failing to raise the issue of the erroneous intent instruction. The respondent, the Commissioner of Correction, filed a return and various special defenses.

The matter was tried to the habeas court, *Oliver, J.*, on June 7, 2021, and April 28, 2022. The court admitted various exhibits, including copies of transcripts from the petitioner's criminal trial, and heard testimony from witnesses, including Patel, McKay, Graham, Dalton, and Attorney John R. Gulash, the petitioner's legal expert.

On September 14, 2022, the court issued a memorandum of decision denying the petitioner's operative petition. In addressing the issue of the self-defense instruction vis-à-vis count one, the court concluded that the petitioner had failed to prove that Graham's performance was deficient under the first part of the test for ineffective assistance of counsel set forth in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Regarding the issue of the intent instruction raised in count three, although the court found that Graham had rendered deficient performance by failing to object to that instruction, it concluded that the petitioner had not satisfied the second part of the *Strickland* test by establishing that he was prejudiced as a result of Graham's deficient performance. With regard to count four, predicated on the allegation that Dalton had rendered ineffective assistance on direct appeal by failing to claim that the trial court's jury instruction on intent was improper, the habeas court determined that the petitioner had failed to satisfy either the performance prong or the prejudice prong under *Strickland*. As the court further explained, its

conclusions that Graham and Dalton did not render ineffective assistance were dispositive of the claims against Patel set forth in counts one, three, and four. Thereafter, the petitioner filed a petition for certification to appeal, which the court granted. This appeal followed. Additional facts and procedural history will be set forth as necessary.

Before turning to the petitioner's claims, we set forth the well settled standard of review governing challenges to a habeas court's judgment on ineffective assistance of counsel claims. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . . In a habeas trial, the court is the trier of fact and, thus, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony . . . . It is simply not the role of this court on appeal to second-guess credibility determinations made by the habeas court. . . .

"[I]t is well established that [a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. . . . This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . .

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, [supra, 466 U.S. 687]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . .

"It is axiomatic that courts may decide against a petitioner on either prong [of the *Strickland* test], whichever is easier. . . . [T]he petitioner's failure to prove either [the performance prong or the prejudice prong] is fatal to a habeas petition. . . . [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [petitioner] as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (Citations omitted; internal quotation marks omitted.) *Mercer* v. *Commissioner of*

*Correction*, 222 Conn. App. 713, 722–23, 306 A.3d 1073 (2023), cert. denied, 348 Conn. 953,      A.3d      (2024).

"Our Supreme Court, in *Lozada* v. *Warden*, [223 Conn. 834, 843, 613 A.2d 818 (1992)], established that habeas corpus is an appropriate remedy for the ineffective assistance of appointed habeas counsel, authorizing . . . a second petition for a writ of habeas corpus . . . challenging the performance of counsel in litigating an initial petition for a writ of habeas corpus . . . [that] had claimed ineffective assistance of counsel at the petitioner's underlying criminal trial or on direct appeal. . . . Our Supreme Court subsequently expanded *Lozada*'s holding to encompass third habeas petitions challenging the performance of second habeas counsel. . . . Nevertheless, the court in *Lozada* also emphasized that a petitioner asserting a habeas on a habeas faces the herculean task . . . of proving in accordance with [*Strickland*] both (1) that his appointed habeas counsel was ineffective, and (2) that his trial counsel was ineffective. . . .

"Simply put, a petitioner cannot succeed . . . on a claim that his habeas counsel was ineffective by failing to raise a claim against trial counsel or prior habeas counsel in a prior habeas action unless the petitioner ultimately will be able to demonstrate that the claim against trial or prior habeas counsel would have had a reasonable probability of success if raised." (Citations omitted; internal quotation marks omitted.) *Crocker* v. *Commissioner of Correction*, 220 Conn. App. 567, 585–86, 300 A.3d 607, cert. denied, 348 Conn. 911, 303 A.3d 10 (2023).

On appeal, the petitioner claims that the habeas court improperly rendered judgment in the respondent's favor on counts one, three, and four of the operative petition, which asserted ineffective assistance of counsel claims against Patel predicated on the derivative allegations that Graham and Dalton had rendered ineffective assistance during the criminal trial and on direct appeal, respectively. For the reasons that follow, we disagree.

I

The petitioner first claims that the habeas court improperly rendered judgment in the respondent's favor on count one of the operative petition, in which the petitioner asserted an ineffective assistance of counsel claim as to Patel predicated in relevant part on the allegation that Graham had provided ineffective assistance by failing to request a jury instruction on self-defense. The petitioner asserts that the court incorrectly concluded that he had failed to satisfy the performance prong under *Strickland*. In support of his claim, the petitioner argues that (1) it was possible to raise the defense of self-defense at his criminal trial, even if it contradicted Graham's assertion of a purported "nullification" defense, (2) Graham's attempt to appeal

to the jurors' sympathy by convincing them to disregard the petitioner's statement to the police was not a valid legal defense, and (3) Graham's suggestion during closing argument that the petitioner may have been acting in self-defense during the shooting—without a corresponding instruction on self-defense—likely confused the jury. We conclude that the court correctly determined that the petitioner did not satisfy *Strickland*'s performance prong and, therefore, properly rendered judgment in the respondent's favor on count one.[6]

The following additional facts, as set forth by our Supreme Court in its decision on the petitioner's direct appeal, or as undisputed in the record, and procedural history are relevant to the petitioner's first claim. On the night of his arrest, the petitioner provided police with a statement in which he admitted to shooting the victim (statement). *State* v. *Delgado*, supra, 247 Conn. 622–23. The statement, which was admitted in full during the petitioner's criminal trial, as well as during the habeas trial in the present action, included the following: "I thought this black boy (20 Lover) was talkin shit as he reached like into the front of his waist like he was about to pull out a piece (gun) on me as I pulled out my 9 (millimeter handgun) and just started buckin at the black boy like 12 or 13 times. I heard another gun buckin at the same time like over by the store (CBL STORE 63 Norwich St.) and I heard like 5 or 6 shots. I remember when we was buckin (shooting) at the black boy he was like running [across] the street (Stonington St.) towards the park (Colt's Park) and I think one of my shots hit him cause like when I was buckin (shooting) he fell over the fence but Miguel 'Cheese Cake' could have hit him too cause we was both buckin at the same time, but I think I got him!"

During the habeas trial in the present action, Graham testified that the defense strategy was (1) to discredit the petitioner's statement, and (2) to appeal to the jurors, in a manner she characterized as "jury nullification," by highlighting mitigating factors with which the jurors could sympathize. The defense "relied primarily on the testimony of friends and family members who were with [the petitioner] on the night of his arrest to support his contention that he was drunk and high that evening. He claimed that as a result of his intoxication, his statement to the police concerning the shooting was unreliable." *State* v. *Delgado*, supra, 247 Conn. 629.

In addition, Graham testified during the habeas trial that she wanted the jury to consider secondarily the concept of self-defense. During his closing argument, the prosecutor remarked that "[on] the night of the murder . . . the [petitioner] happens upon [the victim] . . . . Words are exchanged. . . . At that point, the [petitioner] thinks . . . the victim is going to pull out a gun. [The petitioner] [p]ulls out his gun. And in his words, he . . . [s]tarted buckin' at the black boy, like

twelve or thirteen times." At the outset of her closing argument, Graham stated: "I'd like to . . . address some of the points that [the prosecutor] brought up in his argument. . . . What the [petitioner's] statement goes on to indicate is some type of self-defense argument. . . . What the evidence shows, if you choose to believe th[e] [petitioner's] statement, is that there were words had . . . between [the petitioner] and [the victim]. And that would have been—[the petitioner] believed that someone was pulling a gun out, that [the victim] was pulling a gun out, and he fired in self-defense. That's if you believe the statement. But, I submit to you that this statement should not be believed. And I will go on as to why." Graham primarily challenged the circumstances of the case and attacked the credibility of the statement throughout the remainder of her argument. Following the conclusion of closing arguments and outside the presence of the jury, the court commented that Graham had referred to self-defense during her argument and asked if she wanted the court to give a jury instruction on self-defense, which she declined. Graham testified that she declined a self-defense jury instruction because she did not believe it would be helpful to the defense case.

In its decision, the habeas court stated that "[a]t the habeas trial . . . Graham said that the defense theory was jury nullification. The state's case hinged on the petitioner's statement to the police. . . . Graham unsuccessfully sought to suppress the statement, in which the petitioner admitted to shooting the victim, and concluded that it was likely that the petitioner was going to be convicted based on his statement. . . . Graham strove to affect the jury by highlighting the petitioner's age—sixteen at the time of the offense and eighteen at the time of the criminal trial—and other factors to appeal to the jurors. Those other factors included the police interviewing the petitioner without a parent present or consenting to the interview, as well as his drug and alcohol use at a tender age. . . . Graham's efforts to humanize the petitioner were intended to convince the jurors that they should disregard or throw out his confession because of all the circumstances surrounding the petitioner and the way his statement was taken. . . . Graham also attempted to attack the credibility of the police officers who took the statement and the reliability of the confession. . . .

"Graham investigated a self-defense claim but did not locate any witness or discover any evidence to corroborate the petitioner's indication that the victim moved in a way that could be interpreted as reaching for a weapon. To the contrary: the victim being shot in the back of his leg and arm supported the contention that he was fired upon as he was fleeing. . . .

"Graham tried to convince the [jurors] that if they believed the petitioner's confession, then they should

also believe him when he said that the victim was reaching to his front as if he were getting ready to pull out a gun. . . . Graham viewed this argument as supporting self-defense. Conversely, if the jury did not believe the petitioner's statement to the police, then the jury should not convict him. . . . [Graham's] main objective was to have the jury . . . not consider the petitioner's statement. The secondary objective, if the jury instead believed the statement, was to convince the jurors that they should also believe that the petitioner thought the victim was moving his arm toward his waist to get a gun. . . .

"Graham did not think that the petitioner would present well to the jury—he was angry, would say anything, and it was uncertain what he would testify to. Additionally . . . Graham did not want the petitioner to testify in support of self-defense because his statement to the police did not indicate that he saw an actual weapon. . . . Graham did not request an instruction on self-defense because she did not think that the jury would find that the petitioner had a reasonable belief that the victim was pulling a gun on him. If the [jurors] were instructed on self-defense, then they would be required to take a closer look at the specific evidence to determine if his belief that the victim had a gun was reasonable. . . . Graham viewed that as too risky for the defense and likely to fail.

"On cross-examination . . . Graham acknowledged that she was aware of all the issues that would arise if the jury were instructed on self-defense. For example, there is a duty to retreat, the use of force by the other person cannot be provoked, one cannot be the initial aggressor, one must reasonably believe that the attacker is about to use force, and one must reasonably believe that the use of deadly force is necessary to repel the attack. The facts of the petitioner's case—the victim was running away from two shooters; the victim was shot twice from behind; the petitioner never saw the victim with a gun; no gun was found on the victim or in his vehicle—made it highly unlikely that self-defense would prevail." Accordingly, the court concluded that Graham had a reasonable basis for choosing to decline a self-defense instruction and that this decision was a matter of sound trial strategy. We agree with the habeas court's assessment of Graham's defense strategy.

The following additional legal principles are relevant to the petitioner's first claim on appeal. "[A] defendant has no burden of persuasion for a claim of self-defense; he has only a burden of production. That is, he merely is required to introduce sufficient evidence . . . [if credited by the jury] to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in self-defense. . . .

"[T]o submit a [self-defense] defense to the jury, a defendant must introduce evidence that the defendant

reasonably believed [the attacker's] unlawful violence to be imminent or immediate. . . . Under [General Statutes] § 53a-19 (a), a person can, under appropriate circumstances, justifiably exercise repeated deadly force if he reasonably believes both that [the] attacker is using or about to use deadly force against [himself] and that deadly force is necessary to repel such attack. . . . The Connecticut test for the degree of force in self-defense . . . is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable. . . .

"As to whether the defendant had a reasonable belief that the attacker was using or was about to use deadly force, it is not enough for a defendant to fear the victim . . . . Rather, a defendant must introduce evidence that the defendant reasonably believed his adversary's unlawful violence to be imminent . . . . Evidence of imminent violence must be such that the jury must not have to resort to speculation in order to find that the defendant acted in justifiable self-defense. . . .

"As to whether the defendant had a reasonable belief that deadly force was necessary to repel the attacker's use of deadly force, there are two essential parts [to this] necessity requirement, which are that force should be permitted only (1) when necessary and (2) to the extent necessary." (Citations omitted; internal quotation marks omitted.) *State* v. *Hargett*, 343 Conn. 604, 619–21, 275 A.3d 601 (2022).

As Graham recognized, the petitioner's statement, as well as the lack of evidence supporting a self-defense theory, presented significant challenges to the defense. Graham testified that the outcome of the petitioner's case "hinged upon [his] confession." Similarly, the respondent, in his appellate brief, acknowledged that "[t]he key piece of evidence against the petitioner was [the statement]." Graham employed a strategy in which she attempted to persuade the jury to disregard the evidence that was key to the state's case by attacking the credibility of the police officers involved in the petitioner's arrest and the reliability of the statement itself. At the same time, the statement "also contained [the petitioner's] indication that he thought that the victim was reaching toward the front of his waist as if the victim were about to pull out a gun on the petitioner." Although the petitioner's expert witness at the habeas trial, Gulash, testified that he saw "no basis for defense counsel to turn down the [criminal trial] court's invitation to give a self-defense instruction," Graham testified that she had investigated a possible defense of self-defense but was unable to find a witness or other evidence corroborating the petitioner's belief that the victim was reaching for a weapon. Because the physical evidence showed that the victim was shot from behind

and was not carrying a weapon, it supported the contention that he was fired on as he was fleeing and defenseless. In addition, Graham's testimony iterated that the petitioner "never saw a gun or . . . never said he saw a gun." For these reasons, Graham believed that a defense of self-defense was both unwinnable and detrimental to her preferred strategy, noting that a self-defense instruction would require the jury to scrutinize unfavorable physical evidence in order to determine whether the elements of self-defense were met.

The petitioner nevertheless argues that the unfavorable evidence is not dispositive of the issue, the state would not have overcome its burden of disproving self-defense beyond a reasonable doubt, and a self-defense instruction would have inspired the jury to reconsider the statement in a more favorable context in light of the elements of self-defense. As the habeas court stated, however, the effect of the statement on the defense strategy was to position Graham "literally between Scylla and Charybdis: her closing argument raised self-defense, but she did not want a self-defense instruction; the petitioner's statement should be disregarded completely by the jury, but it also was necessary to establish self-defense." Although we remain mindful of the fact that the jury was entitled to credit or discredit portions of the petitioner's statement in consideration of a self-defense claim; see, e.g., *Morales* v. *Commissioner of Correction*, 220 Conn. App. 285, 311, 298 A.3d 636 (fact finders are "free to juxtapose conflicting versions of events and determine which is more credible" (internal quotation marks omitted)), cert. denied, 348 Conn. 915, 303 A.3d 603 (2023); the petitioner is required to show that Graham's decision to decline the instruction "fell below an objective standard of reasonableness as measured by prevailing professional norms" when "considering all of the circumstances . . . ." (Internal quotation marks omitted.) Id., 305. "[A] petitioner will not be able to demonstrate that trial counsel's decisions were objectively unreasonable unless there was no . . . tactical justification for the course taken. . . . Further, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." (Citation omitted; internal quotation marks omitted.) Id., 313.

The physical evidence presented at the criminal trial indicating that the victim was fleeing and weaponless supports Graham's concerns that a self-defense instruction might have led the jury to afford more credit to the statement, wherein the petitioner described, for example, "[shooting] . . . at the black boy [while] he was like running [across] the street," or to lose sympathy for the petitioner. At the habeas trial, Graham testified that she presented the jury with self-defense as a secondary consideration, which addressed remarks the

prosecutor made during his closing argument, while preserving the strategy she had employed throughout trial. Given that self-defense was inconsistent with the evidence presented in the case, her closing argument was a mechanism in which she made a tactical decision to afford the jury two potential pathways to find the petitioner not guilty of murder without foreclosing the reasonable and well supported defense strategy of attacking the credibility of the statement. We therefore cannot conclude that there was no tactical justification for Graham's decision to decline a self-defense jury instruction.

In sum, in light of our review of the record, we agree with the habeas court's conclusions under *Strickland* that Graham did not render deficient performance by declining a self-defense jury instruction and, therefore, that the petitioner's ineffective assistance of counsel claim against Patel in count one of the operative petition necessarily fails. Accordingly, we conclude that the court properly rendered judgment in favor of the respondent on count one of the operative petition.

II

We next address the petitioner's claims that the habeas court improperly rendered judgment in the respondent's favor on counts three and four of the operative petition, in which the petitioner asserted ineffective assistance of counsel claims as to Patel predicated in relevant part on the allegations that (1) Graham had provided ineffective assistance by failing to object to the trial court's incorrect jury instruction on intent and (2) Dalton had provided ineffective assistance on direct appeal by failing to claim error as to that instruction. We do not agree.

A

The record reveals the following additional procedural history relevant to our disposition of this claim. At the petitioner's criminal trial, the court instructed the jury on both murder and, at the state's request, the lesser included offense of manslaughter in the first degree with a firearm. The court also instructed the jury that, if it did not find the petitioner guilty of either of those offenses, it could consider whether to find him guilty of, respectively, having been an accessory to murder or an accessory to manslaughter in the first degree with a firearm. With respect to the murder charge, the trial court's instructions to the jury in relevant part included the following:

"[The Court]: Now, the murder statute, as pertinent here, reads as follows: Person is guilty of murder when, with the intent to cause the death of another person, he causes the death of such person.

"There are three elements necessary for the state to prove beyond a reasonable doubt in order to warrant a conviction. First, was the death of [the victim] caused

by another? Second, was it caused by the [petitioner]? And, third, did the [petitioner] intend to cause the death? . . .

"As to the third element, a person acts intentionally, with respect to a result or to conduct, when his objective is to cause such result or to engage in such conduct. As you can see, we can't look into a mind of a person to determine their intent. And if the intent is to be determined at all, it must be determined from the circumstances surrounding that person's conduct or action.

"As to the nature of the evidence to present or consider here, as to the third element, is the number of shots that were fired. From the [petitioner's] statement, he indicated he fired twelve or thirteen shots. And of course, this is consistent with the thirteen shell casings that were picked up in the spot near the—[the victim's] back door.

"You may consider as well the length of time that the shooting took place on. And of course, the only way to estimate that is from the distance from the decedent's car; across the road, and across the grassy area to the fence, over the fence. And as I recall, the [petitioner's] statement was that, at that point, he thought he had hit the decedent. But, because Cheesecake was still firing . . . Cheesecake may've hit the decedent.

"If you find that the state has proved each of these elements to you beyond a reasonable doubt, then you must find the [petitioner] guilty as charged of murder. On the other hand, if you find that the state has failed to prove any one of these elements to you beyond a reasonable doubt, you must find him not guilty as to the charge of murder.

"However, if the element that you do not find to be proved beyond a reasonable doubt is the second, which is, was the death caused by the [petitioner], you may consider whether or not he was an accessory to murder. And the statute, as applied to this case and pertinent to this case, reads as follows: A person acting with a mental state required for the commission of an offense, who intentionally aids another person to engage in conduct which constitutes an offense, shall be criminally liable for such conduct. And I've already defined for you intent from the statute. And it is the same that applies to the intent of this statute. And again, intent can only be determined, if determined at all, from the circumstances surrounding the actor or doer's conduct.

"Now, it is not enough that the [petitioner] committed acts which may in fact have aided the committing of the criminal act. One who is present when a crime is committed, but neither assists in its commission nor shares in its criminal intent, cannot be convicted as an accessory. Mere presence is not enough, nor passive

acquiescence is not enough.

"To be an accessory, the [petitioner] must have criminal intent in community of unlawful purpose with the one who did the criminal act or caused the death.

"The question before you then is this: Did the [petitioner] intend to aid the person who caused [the victim's] death? And in so doing, did he intend to have the crime of murder committed? If you find that the state has proved that the [petitioner] intended to aid the person who caused the death, and in so doing, did intend to have the crime of murder committed, then you must find the [petitioner] guilty of being an accessory to murder. On the other hand, if the state has failed to so prove, you must find the [petitioner] not guilty of accessory to murder."

The petitioner asserts that the habeas court incorrectly concluded that he failed to satisfy the prejudice prong[7] under *Strickland* with respect to his ineffective assistance of counsel claim set forth in count three. We conclude that the court correctly determined that the petitioner did not satisfy *Strickland*'s prejudice prong and, therefore, properly rendered judgment in the respondent's favor on count three.

In count three of the operative petition, the petitioner alleged in relevant part that Graham rendered ineffective assistance by failing to object to the trial court's instruction on the intent element of murder. In his post-trial brief to the habeas court, the petitioner maintained that the court at his criminal trial had improperly read the entire definition of intent set forth in General Statutes § 53a-3 (11) when instructing the jury on murder, a specific intent crime, and never properly defined "intent" throughout the remainder of the instructions. The petitioner further maintained that, "[i]n spite of noticing the [erroneous intent instructions] and understanding that this error would make it easier for the jury to convict the petitioner of murder, [Graham] still did not raise an objection to the instruction."

In its decision, the habeas court stated in relevant part that, "[a]lthough it may be relatively easy to conclude that . . . Graham was deficient for not objecting to the intent instruction . . . whether the petitioner was prejudiced arrives at a different conclusion. . . . The [trial] court . . . referred back to its initial definition of intent when it instructed the jury on the elements of accessory to murder. . . . However, the court also *distinguished* the intent element for manslaughter from that necessary for murder: '. . . you did not find that the state had proved the third element of murder, that is, that [the victim's] death was intended'; 'this differs from murder in that, in murder, the intent was to cause the person's death.' . . . The court again highlighted this distinction when instructing the jury on accessory to manslaughter . . . 'those instructions [for acces-

sory to murder] are the same here, except for the state of the [petitioner's] mind, that he intended to cause serious physical injury, rather than intending to cause death.' . . . Th[is] court finds that it is not reasonably possible that the court's instruction on specific and general intent misled the jury. Viewing the jury charge in its entirety, it was clear that murder required the specific intent to cause [the victim's] death and not the general intent to engage in conduct described by a statute defining an offense." (Citations omitted; emphasis in original.) The court further stated that, "[h]aving failed to demonstrate that the petitioner was prejudiced by . . . Graham's failure to object to the instruction, the court concludes that . . . Graham did not render ineffective assistance of counsel. Both second and first habeas counsel, therefore, were not ineffective . . . ."

The petitioner argues that the trial court's subsequent references to the correct intent standard when issuing the instruction on manslaughter "did not serve to clarify the instruction on murder." The petitioner also argues that the habeas court made its determination despite incorrectly distinguishing two cases "in part by citing to the fact that an incorrect instruction was given to each of those juries multiple times" as the court did in the petitioner's underlying criminal trial. We are unpersuaded.

"[T]he specific intent to kill is an essential element of the crime of murder . . . . To act intentionally, the defendant must have had the conscious objective to cause the death . . . .

"Intent to engage in proscribed conduct that results in death and physical injury is not sufficient. . . . As our Supreme Court has previously stated, '[i]t is improper for the trial court to read an entire statute to a jury when the pleadings or the evidence support a violation of only a portion of the statute . . . .'

"When reviewing a challenged jury instruction . . . [the standard is] whether it is reasonably possible that the jury [was] misled. . . . In determining whether it was . . . reasonably possible that the jury was misled . . . the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State v. DeBarros*, 58 Conn. App. 673, 680–82, 755 A.2d 303, cert. denied, 254 Conn. 931, 761 A.2d 756 (2000).

In concluding that the petitioner failed to satisfy

*Strickland*'s prejudice prong, the habeas court in part distinguished the facts of the petitioner's case from those in *State* v. *DeBarros*, supra, 58 Conn. App. 673, and *State* v. *Sivak*, 84 Conn. App. 105, 852 A.2d 812, cert. denied, 271 Conn. 916, 859 A.2d 573 (2004). In *DeBarros*, this court determined that it was "reasonably possible that the jury was misled [by improper instructions] because the probable effect of the improper charge was that it guided the jury to an incorrect verdict." *State* v. *DeBarros*, supra, 682–83. In distinguishing the improper instructions in *DeBarros* from those in *State* v. *Prioleau*, 235 Conn. 274, 322, 664 A.2d 743 (1995), and *State* v. *Austin*, 244 Conn. 226, 235, 710 A.2d 732 (1998), in which our Supreme Court determined that any instructional errors were harmless, this court considered, in particular, the numerosity of the instructions and the order in which they were given. This court explained that "[t]he trial court [improperly] instructed on intent to 'engage in conduct' language once in *Prioleau* and twice in *Austin*. In each case, the trial court's proper instructions eliminated the risk of jury confusion over the element of intent. [In *DeBarros*], the trial court's improper instructions were too numerous to be rectified by the court's proper instructions. In total, the court either read or referred back to the improper instruction ten times." *State* v. *DeBarros*, supra, 683. This court further explained that, "in both *Prioleau* and *Austin*, the trial court read the improper instruction only as part of a general definition of intent," whereas in *DeBarros*, "the court read the instruction as a specific definition of the intent required for the crimes charged," and that "[t]he order in which the instruction [in *DeBarros*] was read likely misled the jury to believe that to intend to cause the death of another person means either to intend to cause the death of that person or to intend to engage in conduct that causes the death of that person." Id., 683–84.

Similarly, this court concluded in *Sivak* that the defendant was entitled to a new trial as a result of the trial court's having improperly included general intent language in its instructions on a specific intent crime. See *State* v. *Sivak*, supra, 84 Conn. App. 113. In rendering its decision, this court noted that "appellate review should consist of more than a numerical count of how many times the instruction was correct rather than incorrect"; id., 112; and determined that the instruction's misleading effect in that case was compounded in the numerous *additional* errors that the trial court made subsequent to the challenged charge, finding that, "[a]lthough the [trial] court in some portions of its charge correctly limited a finding of guilty . . . to require a finding of intent to cause serious physical injury, in other portions it added to the mistake. For example, immediately after improperly charging the jury as to the inapplicable alternative definition of intent, the court distinguished intentional *conduct* from

unintentional *conduct*, rather than distinguishing between intended serious physical injury and unintentional serious physical injury. Also, the court's instruction as to how to determine intent was couched in terms of *conduct*." (Emphasis in original.) Id., 109–10. In another example, defense counsel in *Sivak* had objected to the reading of the incorrect intent standard during the trial. The trial court "decided that defense counsel's objection was not apt and stated that 'in thinking over the evidence, I think [the defendant's] conduct—the full definition of intent is applicable in view of the evidence in this case.' . . . Thus, the defendant directed the court to the specific misstatement, but . . . the court persisted in not limiting its instruction . . . making the charge applicable to the definition of intent as to all three counts." Id., 108–109. As this court summarized, "the charge on intent to cause serious physical injury was key to the issue of the defendant's guilt." Id., 113.

Upon our review of the trial court's charge as a whole, and cognizant of the principles set forth in *DeBarros* and *Sivak*, we agree with the habeas court that it is not reasonably possible that the instruction on the element of intent misled the jury. The court at the petitioner's criminal trial initially read the murder statute, which included the correct specific intent language. Following the court's improper inclusion in its instruction on murder of the entire definition of intent under § 53a-3 (11), it repeatedly referenced the specific intent language when instructing the jury on manslaughter in the first degree with a firearm as a lesser included offense of murder and accessorial liability as it applied to murder and manslaughter in the first degree with a firearm. Most importantly, the court correctly distinguished for the jury the intent elements of manslaughter and accessory to manslaughter from the specific intent language of the murder charge and accessory to murder. See, e.g., *Moody* v. *Commissioner of Correction*, 127 Conn. App. 293, 306, 14 A.3d 408 (no reversible error when court read numerous proper instructions following improper instruction and "expressly pointed out that specific intent was an element of murder but not of manslaughter in the first degree"), cert. denied, 300 Conn. 943, 17 A.3d 478 (2011). By stressing and emphasizing the differences between the elements of the offenses under which the jury could have found the petitioner guilty, the court eliminated any risk of confusion over the element of intent that could have been caused by its improper prior instruction. Moreover, on the basis of the record in its entirety, including the petitioner's incriminating statement to the police and the corroborating physical evidence the state presented at trial; see *State* v. *Sivak*, supra, 84 Conn. App. 112 ("whether a jury instruction led to an unreliable verdict is gauged not only by the language of the entire charge, but by the evidence as well"); we conclude that the

petitioner failed to demonstrate a substantial likelihood that the outcome of the trial would have been different had Graham objected to the intent instruction.

In sum, we conclude that the habeas court correctly determined that the petitioner failed to satisfy the prejudice prong under *Strickland* as to Graham's deficient performance regarding the jury instruction on intent and, therefore, that the petitioner's ineffective assistance of counsel claim against Patel in count three of the operative petition necessarily fails. Accordingly, we further conclude that the court properly rendered judgment in the respondent's favor on count three.

B

The petitioner also contends that the habeas court incorrectly concluded that he had failed to satisfy either the performance prong or the prejudice prong under *Strickland* with respect to count four of the operative petition. We conclude that the court correctly determined that the petitioner did not satisfy *Strickland*'s prejudice prong and, accordingly, properly rendered judgment in the respondent's favor on count four.

We first set forth the standard of review and relevant legal principles governing ineffective assistance claims against appellate counsel. "The two-pronged test of *Strickland* v. *Washington*, [supra, 466 U.S. 687], applies to claims of ineffective assistance of appellate counsel. . . . *Strickland* requires that a petitioner satisfy both a performance and a prejudice prong. . . .

"[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . . In a habeas proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation . . . but by demonstrable realities. . . .

"To establish that the petitioner was prejudiced by appellate counsel's ineffective assistance, the petitioner must show that, but for the ineffective assistance, there is a reasonable probability that, if the issue were brought before us on direct appeal, the petitioner would have prevailed." (Internal quotation marks omitted.) *Ayuso* v. *Commissioner of Correction*, 215 Conn. App. 322, 368–69, 282 A.3d 983, cert. denied, 345 Conn. 967, 285 A.3d 736 (2022).

"In regard to the second prong, our Supreme Court distinguished the standards of review for claims of ineffective trial counsel and ineffective appellate counsel. . . . For claims of ineffective appellate counsel, the second prong considers whether there is a reasonable

probability that, but for appellate counsel's failure to raise the issue on appeal, the petitioner would have prevailed in his direct appeal, i.e., reversal of his conviction or granting of a new trial. . . . This requires the reviewing court to [analyze] the merits of the underlying claimed error in accordance with the appropriate appellate standard for measuring harm.

"In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Citations omitted; internal quotation marks omitted.) *Moore* v. *Commissioner of Correction*, 119 Conn. App. 530, 535, 988 A.2d 881, cert. denied, 296 Conn. 902, 991 A.2d 1103 (2010).

In count four of the operative petition, the petitioner alleged that Patel had rendered ineffective assistance on the basis of the derivative allegation that Dalton had rendered ineffective assistance on direct appeal when she failed to raise the issue of the incorrect intent instruction. In its decision, the habeas court found that "Dalton's review of the record led to her conclusion that the trial court correctly instructed the jury on specific intent [for the murder charge], and that the correct intent instruction was repeated. . . . Dalton concluded that it was not a claim worth pursuing, although she did raise a claim challenging the dual intent instruction for accessorial liability." In addition, and as the habeas court recognized, our Supreme Court in the petitioner's direct appeal concluded that, "[u]pon examining the entire jury charge . . . the trial court properly instructed the jury regarding accessorial liability. . . . [N]othing in the challenged charge reasonably could have been interpreted as relieving the state of its burden of proving that the [petitioner] himself intended both to aid Cheesecake and to kill the victim. Consequently, an examination of the court's instructions as a whole reveals that it is not reasonably possible that the jury was misled." *State* v. *Delgado*, supra, 247 Conn. 627. In light of the "strong presumption that . . . Dalton rendered adequate assistance," and seemingly guided by our Supreme Court in its consideration of the entire jury charge in resolving a similar claim, the habeas court determined that "Dalton's decision to not raise a claim challenging the intent instruction for murder was done within the parameters of sound professional judgment . . . ." The habeas court further determined that, even if it is assumed Dalton had rendered deficient performance, "the petitioner has failed to demonstrate that he was prejudiced because he has not shown that he would have prevailed on direct appeal had . . . Dalton raised this claim. Both second and first habeas counsel, therefore, were not ineffective for not raising [this] claim . . . ."

On appeal, the petitioner claims that the habeas court erred in rejecting the merits of count four under both prongs of *Strickland*. As the petitioner argues, "[t]he intent instruction was wrong. . . . [T]here is a reasonable chance that the jury was misled by the incorrect instruction, establishing harm. Therefore, there was a meritorious claim about the intent instruction that Dalton failed to claim, and, because it likely misled the jury, it was reasonably probable that Dalton would also have been able to establish harm on direct appeal." On the basis of our review of the merits of the underlying claimed error set forth in part II A of this opinion, however, we conclude that it is not reasonably probable that the petitioner would have prevailed on his direct appeal such that he has not demonstrated prejudice under *Strickland*. We therefore conclude that the court properly rendered judgment in the respondent's favor on count four.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

[3] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[4] Our Supreme Court remanded the case to the trial court with direction to vacate the conviction as to the firearm charge and "to resentence [the petitioner] to a total effective term of imprisonment of sixty-five years . . . ." *State* v. *Delgado*, supra, 247 Conn. 634.

[5] In count two of the operative petition, the petitioner alleged that Patel had rendered ineffective assistance by not raising the claim that McKay had rendered ineffective assistance by failing to assert that Graham had rendered ineffective assistance when she failed to move to suppress the petitioner's statement to the police as fruit of the poisonous tree. The habeas court, *Oliver*, *J.*, rendered judgment in favor of the respondent, the Commissioner of Correction, on count two. The petitioner is not challenging on appeal this portion of the judgment.

[6] The petitioner further contends that he was prejudiced by Graham's purported deficient performance. Because we conclude that the habeas court properly determined that Graham's performance was not deficient, we need not address *Strickland*'s prejudice prong.

[7] The respondent concedes in his appellate brief that the habeas court properly concluded that Graham had rendered deficient performance by failing to object to the intent instruction.