******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JAMES HILTON *v.* COMMISSIONER
OF CORRECTION
(AC 46270)

Alvord, Moll and Clark, Js.

*Syllabus*

The petitioner sought relief in a second petition for a writ of habeas corpus, claiming, inter alia, that R, his counsel during his first habeas action, and G, his criminal trial counsel, had rendered ineffective assistance by failing to present expert testimony from a forensic pathologist to support the petitioner's claim of actual innocence. The petitioner had been convicted of several crimes, including murder, as a result of a drug related shooting. K, an associate medical examiner, had performed an autopsy that showed that the victim died from a single gunshot to the head at close range. At the petitioner's criminal trial, K testified that the barrel of the gun had been touching the victim's skin when the gun was discharged and that the wound was a typical contact gunshot wound of entrance. This court upheld the petitioner's conviction on direct appeal. At his first habeas trial, R presented the testimony of C, the state's chief medical examiner, which was consistent with that of K, and the testimony of D, a forensic scientist. At that habeas trial, the petitioner claimed, inter alia, that G had improperly failed to present the testimony of an expert witness, such as D, to attack K's testimony. D, however, testified at the first habeas trial that the victim's wound could resemble a contact wound but that he could not conclude with certainty that the victim had sustained a contact wound. The habeas court denied the habeas petition, concluding that the petitioner had failed to establish that G rendered ineffective assistance. This court upheld the habeas court's decision, concluding that D had not contradicted K's opinion at the criminal trial that the victim's wound was a contact gunshot wound and that D's testimony would not have been helpful at the criminal trial to establish that the petitioner did not shoot the victim. At the second habeas trial, the petitioner presented the testimony of W, an expert in forensic pathology, who disagreed with K's conclusion that the victim suffered from a contact wound. The habeas court declined to credit W's testimony, reasoning that W had not reviewed certain testimony and that his opinion did not overcome the overwhelming evidence the state presented against the petitioner at the criminal trial. The court denied the habeas petition, concluding that the petitioner failed to establish that G and R had rendered ineffective assistance. The court thereafter granted in part and denied in part the petitioner's petition for certification to appeal. *Held*:

1. The habeas court correctly determined that the petitioner had failed to establish that he was prejudiced as a result of G's and R's decisions not

to present the testimony of a forensic pathology expert: W's testimony, at best, challenged the nature of the victim's injury and was inconsistent with that of witnesses at the petitioner's criminal trial that the petitioner had been standing next to the victim when the shooting occurred, and G had presented testimony similar to that of W at the criminal trial; moreover, W's testimony did not undermine confidence in the outcome of the criminal trial, as C's testimony was consistent with that of K and other state's witnesses, and the state had presented what this court in the petitioner's two prior appeals characterized as overwhelming evidence against the petitioner at his criminal trial; accordingly, a reasonable probability did not exist that the outcome of the petitioner's criminal trial would have been different had G presented expert testimony from a forensic pathologist such as W, and, because the petitioner failed to establish that he was prejudiced by G's performance, the petitioner's ineffectiveness claim necessarily failed as to R.

2. The petitioner could not prevail on his claim that the habeas court abused its discretion in denying him certification to appeal as to his claim that the court had applied the wrong legal standard in finding W not credible; the petitioner failed to demonstrate that his claim was debatable among jurists of reason, that a court could resolve the issue in a different manner or that the question was adequate to deserve encouragement to proceed further.

3. This court dismissed the petitioner's appeal as to his claim that the habeas court had applied an erroneous legal standard in concluding that W's testimony was not credible when it denied the petitioner certification to appeal as to that issue: contrary to the petitioner's contention that the habeas court should have relied on *Lapointe* v. *Commissioner of Correction* (316 Conn. 225) and assessed W's credibility in light of whether a jury could have credited W's testimony, the petitioner's claim was factually distinguishable from *Lapointe*, in which the state's case was relatively weak, whereas the state in the present case had presented overwhelming evidence against the petitioner, and legally distinguishable from *Lapointe*, which limited appellate evaluation of an expert witness' credibility to claims under *Brady* v. *Maryland* (373 U.S. 83), in which a habeas court's function, as part of its determination of the legal question of materiality, is to make a predictive evaluation, rather than an absolute finding, as to whether the evidence withheld by the state reasonably could be credited by the ultimate fact finder and, if so, whether that evidence reasonably could lead to a different result at a trial; moreover, the court in *Lapointe* neither precluded a habeas court from determining the credibility of an expert witness and that witness' conclusions, as the petitioner claimed, nor did the court in *Lapointe* establish that a petitioner is entitled to a new trial by presenting an expert of sufficient import and credibility, as such a vague standard could necessitate a new criminal trial in nearly all postconviction habeas

proceedings involving expert witnesses; accordingly, this court determined that *Lapointe* was inapplicable to the petitioner's case and would not disturb the habeas court's factual finding that W was not credible.

Argued January 31—officially released May 7, 2024

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Klatt, J.*; judgment denying the petition; thereafter, the court granted in part and denied in part the petition for certification to appeal, and the petitioner appealed to this court. *Affirmed*; *appeal dismissed in part*.

*Alexander T. Taubes*, for the appellant (petitioner).

*Linda F. Rubertone*, senior assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's attorney, and *Craig P. Nowak*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

ALVORD, J. The petitioner, James Hilton, appeals from the judgment of the habeas court denying his second petition for a writ of habeas corpus.[1] On appeal,

---

[1] The habeas court granted in part and denied in part the petitioner's petition for certification to appeal from the judgment of the habeas court. "We are mindful of our jurisprudence that, following the granting of a petition for certification to appeal, 'at least in the absence of demonstrable prejudice, the legislature did not intend the terms of the habeas court's grant of certification to be a limitation on the specific issues subject to appellate review.' *James L.* v. *Commissioner of Correction*, 245 Conn. 132, 138, 712 A.2d 947 (1998). Thus, 'once the habeas court, in its gatekeeping function, certified that appellate review was warranted, any issue could be presented on appeal, so long as the opposing party is not prejudiced.' *Logan* v. *Commissioner of Correction*, 125 Conn. App. 744, 753 n.7, 9 A.3d 776 (2010), cert. denied, 300 Conn. 918, 14 A.3d 333 (2011). In *James L.*, however, the court expressly noted: 'This case does not present a question of mixed certification, in which a habeas court expressly grants permission to appeal with regard to some, but not all, of the issues on which certification was requested.' *James L.* v. *Commissioner of Correction*, supra, 138 n.7. It remains unsettled whether a habeas petitioner is limited in the claims he or she may pursue on appeal when a habeas court grants certification to appeal as to certain specific claims and denies certification to appeal as to others." *Diaz* v. *Commis-*

the petitioner claims that the habeas court (1) improperly rejected his claim that his right to the effective assistance of counsel was violated when his first habeas counsel, Attorney David B. Rozwaski, failed to present the expert testimony of a forensic pathologist in support of his claim that the petitioner's criminal trial counsel, Attorney Al Ghiroli, had provided ineffective assistance of counsel and (2) abused its discretion in denying his petition for certification to appeal as to his claim that the habeas court applied the wrong legal standard in assessing witness credibility. We affirm the judgment of the habeas court as it relates to the petitioner's first claim. We dismiss the appeal as to the petitioner's second claim.

The following facts and procedural history, as set forth by this court in the petitioner's direct appeal from his conviction or as undisputed in the record, are relevant to our resolution of the petitioner's appeal. "The victim, William Rodriguez, was shot on July 14, 2000, at approximately 9 p.m. in the area of Truman Street and King Place in New Haven. Sergeant Anthony Duff arrived at the scene of the shooting and discovered the victim's body on the sidewalk, surrounded by a crowd of people. An autopsy performed on the victim's body revealed that he died from a single gunshot at close range to the left side of his head. Bullet fragments removed during the victim's autopsy were tested and found to be consistent with having been fired from either a .38 special or a .357 magnum firearm. No gun was ever recovered.

"The shooting was precipitated by a drug turf war. Anna Rodriguez, the victim's longtime friend, testified

*sioner of Correction*, 214 Conn. App. 199, 202 n.1, 280 A.3d 526, cert. denied, 345 Conn. 967, 285 A.3d 736 (2022). In this case, as in *Diaz*, "[b]ecause neither party has challenged the propriety of the habeas court's unusual mixed certification order, we leave that issue for another day and simply address each of the petitioner's claims in turn." Id.

that two days before the murder, she and her boyfriend had gone to visit the victim, who had just moved to an apartment on Truman Street. Rodriguez testified that upon arriving outside the victim's apartment, her boyfriend sounded his car horn, and the victim and his girlfriend, Cora Moore, came outside to visit them. At that point, the [petitioner] suddenly approached on the passenger's side of the car and peered inside. When the [petitioner] recognized Rodriguez' boyfriend, he walked away.

"The jury also heard testimony from Sherice Mills, who stated that on the afternoon of the shooting, 'Shawn,' an associate of the victim, verbally confronted the [petitioner] and one of his associates regarding Shawn's drug dealing activities on Truman Street, which was part of the [petitioner's] drug territory. During that conversation, Shawn threatened the [petitioner] and his associate. The confrontation soon ended, and Shawn and the victim drove off in the victim's car.

"Two women testified as eyewitnesses to the actual shooting. Mills testified that the victim left his porch to make a drug sale to someone in a car. She testified that moments later, while the victim was at the car, she heard the [petitioner] state that he was 'about to kill [the victim],' and observed the [petitioner] walk across the street and shoot the victim in the head. According to Mills, the [petitioner] fell to the ground with the victim, and the [petitioner] 'kept holding [the victim's] head, saying he didn't mean to do it and [telling] somebody to call the police.' Mills later identified the [petitioner] as the shooter from an array of photographs.

"A second eyewitness, Simone Williams, who was on the porch at the time of the shooting, testified about essentially the same events as did Mills. Williams' testimony added that the [petitioner] had approached the victim from behind and stated: 'You ain't from around

here, son,' and, 'You need to move from around here, son,' and that she then saw the [petitioner] take a gun from behind his back and shoot the victim. When the shooting stopped, Williams testified, the victim fell to the ground, and the [petitioner] yelled for someone to call an ambulance. A short time later, the [petitioner] fled the scene. Williams went to the police station sometime later and related to the police what she had observed concerning the shooting. At that time, she positively identified the [petitioner] in a photographic array and did so again at trial.

"The state also presented testimony from Moore, the victim's girlfriend, that while she was in Toisann Henderson's second floor apartment on Truman Street playing with Henderson's baby and listening to music, she heard a gunshot. Minutes after the shooting, Henderson ran from the porch into the apartment and told Moore that the [petitioner] had shot her boyfriend. Moore ran outside where she found the victim lying motionless on the ground. She fell to the ground and started crying and hugging him. Shortly thereafter, Duff arrived. On the basis of the information that the witnesses provided, Duff dispatched the [petitioner's] description over the police radio.

"At trial, the [petitioner] testified that after meeting with his family, he voluntarily went to the police station, accompanied by his brother-in-law, Sergeant Nate Blackman, and provided a statement about the shooting. While he was in police custody, the [petitioner] stated that he had been sitting on his porch when he heard a commotion and went to see what was happening. The [petitioner] further told the police that a third man had drawn a gun, that the [petitioner] had grappled for the gun, and 'it went bashing across [the victim's] head.' Later in the interview, the [petitioner] was asked if he could give more detail about the shooting. It was at that point that the [petitioner] ended the interview.

At trial, [the petitioner] described how several seconds after he fought with the third man, a fourth man shot the victim and ran away. Immediately after the gunshot, the [petitioner] testified, he applied pressure to the victim's wound to stop the bleeding. [The petitioner] further testified that he left the victim to make sure someone had called an ambulance. When [the petitioner] returned and saw that the victim was receiving aid, he went to and sat on the porch. The [petitioner] testified that he sat on the porch until people in the crowd began to tell the police that he did the shooting. [The petitioner] then stated that he became scared, and went directly to see his children and then to Blackman's house.

"During their investigation, the police learned that after the shooting, the [petitioner] went to see his fiancée, Maybertha Ashley. . . . [H]er sister, Andrea Ashley, testified that the [petitioner] had given his bloody clothes to his fiancée, who in turn gave them to Andrea Ashley to wash. When the police arrested the [petitioner] at the police station, they took the clothing he had worn on the evening of the shooting. The blood samples and clothes collected from both the victim and the [petitioner] were sent to the state forensic laboratory. A state's expert testified that a drop of blood found on the [petitioner's] boxer shorts matched the victim's blood type and DNA. Despite the fact that the victim had been shot at fairly close range, there was no detectable blood on the [petitioner's] other clothes. The [petitioner] denied ever having his clothes washed after the shooting, and explained that his clothes were not covered in blood because he wore his shirt over his head and his pants around his knees.

"On September 12, 2000, the [petitioner] was charged with murder, and criminal possession of and carrying

a pistol or revolver without a permit." (Footnotes omitted.) *State* v. *Hilton,* 79 Conn. App. 155, 157–60, 829 A.3d 890 (2003).

At the petitioner's criminal trial, the state presented the testimony of Arkady Katsnelson, an associate medical examiner in the Office of the Chief Medical Examiner, who had performed the victim's autopsy. Katsnelson testified that, because "there was no evidence of soot or gun powder," the victim's gunshot wound in this particular case resembled either a "long distance" or a contact wound.[2] When asked whether the victim's gunshot wound was typical, Katsnelson testified: "This gunshot wound, it is not typical from a gunshot wound which was created from a long distance because a gunshot wound from a distance will be a round shape, and the round shape wound and the size of the wound will be slightly bigger than the size of the bullet. In this particular case, it's not a typical gunshot wound of entry which is created from a long distance." Thus, Katsnelson testified: "[M]y conclusion is, this gunshot wound is consistent with a contact gunshot wound of entrance. It means in this particular case the barrel of the gun was touching the skin when the gun was discharged. It is the reason for my conclusion, number one, there is no evidence of soot or gunpowder around, and number two, which is extremely important also, the size of the wound. The wound is 3.2 centimeters in vertical dimension and it is 1.2 centimeters in horizontal dimension and it is the reason I believe this gunshot wound is a typical contact gunshot wound."

Following a jury trial, during which the petitioner was represented by Ghiroli, the petitioner was convicted

---

[2] Katsnelson testified that "[a] contact wound means, if the barrel of the gun is touching the skin, touching the body" and that a long distance wound results from a gun generally being "more than three feet" away.

of murder in violation of General Statutes § 53a-54a,[3] carrying a pistol or revolver without a permit in violation of General Statutes (Rev. to 1999) § 29-35 (a),[4] and criminal possession of a pistol or revolver in violation of General Statutes (Rev. to 1999) § 53a-217c.[5] See *State* v. *Hilton*, supra, 79 Conn. App. 156. "On September 28, 2001, the court sentenced the [petitioner] to a term of sixty years imprisonment on the charge of murder, a consecutive term of five years imprisonment on the charge of carrying a pistol without a permit and a concurrent term of five years imprisonment on the charge of criminal possession of a pistol or revolver for a total effective sentence of sixty-five years imprisonment." Id., 160. The petitioner's conviction was affirmed on direct appeal. Id., 170.

Thereafter, the petitioner commenced his first habeas action, during which he was represented by Rozwaski. "In his third amended petition, dated December 19, 2011, [the petitioner] alleged, inter alia, that [Ghiroli] had provided him with ineffective assistance. Specifically . . . [the petitioner] alleged that [Ghiroli] was

[3] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[4] General Statutes (Rev. to 1999) § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon one's person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

[5] General Statutes (Rev. to 1999) § 53a-217c provides in relevant part: "(a) A person is guilty of criminal possession of a pistol or revolver when such person possesses a pistol or revolver, as defined in section 29-27, and (1) has been convicted of a felony . . . ."

ineffective in failing to cross-examine witnesses properly, failing to present witnesses, failing to prepare the petitioner to testify and failing to present sentence mitigation evidence."[6] *Hilton* v. *Commissioner of Correction*, 161 Conn. App. 58, 64–65, 127 A.3d 1101 (2015), cert. denied, 320 Conn. 921, 132 A.3d 1095 (2016).

During the petitioner's first habeas trial, "the petitioner argued that [Ghiroli] was ineffective in his cross-examination of Katsnelson regarding the nature of the victim's fatal wound." Id., 69. "[T]he petitioner presented the expert testimony of Harold Wayne Carver II, the state's chief medical examiner, and Peter DeForest, who held a doctorate degree in forensic science, regarding Katsnelson's autopsy report and conclusions." Id., 69–70.

When asked whether certain indicia "conclusively prove[d] that the wound was made by a contact shot," Carver testified, "I believe that there's sufficient evidence here between the photographs and the written record to make that diagnosis, yes." Carver noted that, had he looked at the autopsy report without the corresponding photographs, then a "contact wound would be on the short list of explanations but would not be the only one." Carver testified that the abnormal shape of the wound, however, is "the major basis for my diagnosis that it was a contact wound . . . ."

---

[6] "The third amended petition also alleged that the petitioner had received ineffective assistance of his appellate attorney, that he was actually innocent of the crimes charged, and that the state had failed to provide him with exculpatory information in violation of his due process rights under *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the United States constitution and the Connecticut constitution." *Hilton* v. *Commissioner of Correction*, 161 Conn. App. 58, 65 n.2, 127 A.3d 1101 (2015), cert. denied, 320 Conn. 921, 132 A.3d 1095 (2016). The petitioner withdrew his claims as to his appellate attorney during his first habeas trial, and, in his appeal following his first habeas trial, the petitioner did not challenge the court's denial of his actual innocence and *Brady* claims. Id.

DeForest testified that, on the basis of the autopsy report and photographs, the wound "[s]uperficially . . . could resemble a contact wound." When asked for his conclusion as to the type of wound the victim suffered, DeForest responded "[t]hat it's—it's ambiguous. I can't eliminate the idea of it being a contact shot where the supporting evidence was not elicited or that it could be a—a destabilized bullet that caused the damage and that the scene investigation didn't find areas or impact sights where a bullet may have interacted with something else." Thus, due to the wound's ambiguities, DeForest testified that he could not conclude with certainty whether the victim suffered from a contact wound.

After the conclusion of the petitioner's first habeas trial, the habeas court issued a memorandum of decision denying the petitioner's claims. On appeal,[7] this court "agree[d] with the respondent [the Commissioner of Correction] and the habeas court that the petitioner failed to sustain his burden of establishing either deficient performance or prejudice with respect to the cross-examination of Katsnelson. As to the former, we have stated that [a]n attorney's line of questioning on examination of a witness clearly is tactical in nature. [As such, this] court will not, in hindsight, second-guess counsel's trial strategy. . . . In regard to the latter, given the other evidence and the inconclusive and indeterminate nature of DeForest's testimony, the petitioner failed to sustain his burden of establishing prejudice."

---

[7] On appeal to this court, the petitioner claimed "that the court improperly concluded that [the petitioner] had received effective assistance of counsel during his criminal trial and at sentencing. Specifically, [the petitioner] argue[d] that [Ghiroli had] provided ineffective assistance by failing to (1) secure sufficient information and properly cross-examine two of the state's witnesses, (2) present witnesses in support of his defense, (3) prepare the petitioner to testify and (4) present sentence mitigation evidence." *Hilton* v. *Commissioner of Correction*, supra, 161 Conn. App. 65.

(Citations omitted; footnotes omitted; internal quotation marks omitted.) *Hilton* v. *Commissioner of Correction*, supra, 161 Conn. App. 70–71. This court also rejected the petitioner's claim that counsel improperly failed to present the testimony of DeForest at his criminal trial to attack the testimony of Katsnelson. See id., 72. This court agreed with the habeas court's analysis that "DeForest's testimony would not have been helpful in establishing that the petitioner did not shoot the victim. Katsnelson had testified at the criminal trial that the fatal wound was a contact gunshot wound. DeForest did not contradict this opinion, 'but could only say that the evidence was ambiguous, and therefore he could not offer an opinion as to the type of wound, and therefore could not say that it was not a contact wound.' " Id., 73–74. Thus, the petitioner did not sustain his burden of proving that the testimony of DeForest would have been helpful to his defense. Id., 74. This court affirmed the judgment of the habeas court,[8] and our Supreme Court denied the petitioner's petition for certification to appeal.

In 2016, the petitioner, then self-represented, filed this second habeas action. In his operative, second amended petition for a writ of habeas corpus filed September 23, 2020, the petitioner raised what the habeas court described as "a myriad of allegations" in thirteen counts. Relevant to this appeal are the petitioner's allegations that Ghiroli and Rozwaski rendered ineffective assistance of counsel by not presenting expert testimony from a forensic pathologist to challenge the testimony of Katsnelson and establish that he was actually innocent. See footnote 12 of this opinion.

[8] The respondent also appealed from the judgment of the first habeas court. See *Hilton* v. *Commissioner of Correction*, supra, 161 Conn. App. 60. On appeal, the respondent claimed "that the court improperly determined that the petitioner received ineffective assistance of counsel with respect to his claim regarding sentence review. As a result of this determination, the habeas court reinstated the petitioner's right to apply for sentence review." Id. The respondent prevailed on appeal, and this court reversed the judgment. Id., 85.

Prior to the start of the habeas trial, on November 30, 2021, the petitioner's counsel filed an appearance on the petitioner's behalf. The matter was tried to the habeas court, *Klatt, J.*, on December 20, 2021, and May 31, 2022. The court admitted into evidence as full exhibits copies of the transcripts of the petitioner's underlying criminal trial and first habeas trial, a copy of a report from the petitioner's forensic pathology expert, Cyril H. Wecht, a copy of Katsnelson's autopsy report, and photographs taken during the autopsy. Additionally, the court heard testimony from the following witnesses: (1) the petitioner; (2) Wecht; (3) Maybertha Ashley; (4) Attorney Michael Brown, the petitioner's legal expert; and (5) Rozwaski. Thereafter, the parties filed posttrial briefs.

Relevant to the petitioner's appeal, Wecht testified that, on the basis of his review of Katsnelson's autopsy report and photographs, certain testimony from the petitioner's criminal trial, including the testimony of Katsnelson, a police report, the petitioner's posttrial brief, and a report from a private investigator service, it was his "opinion this gunshot wound, fatal gunshot wound of the victim's head, was fired from a distance beyond twenty-four inches in the absence of gunpowder residue, stippling powder. I find nothing to contradict that and everything to support it. So I believe this was what we would call a gunshot wound of distance or long-range gunshot wound. I cannot tell you what the distance would have been beyond the twenty-four inches. I can't tell you if that was three feet or four feet. That, I cannot do, but I can say that I believe it was a distance gunshot wound and certainly not a tight contact wound." Wecht testified that, on this basis, he disagreed with Katsnelson's conclusion that the victim suffered from a contact wound.

On February 1, 2023, the court issued a memorandum of decision denying the petitioner's petition for a writ

of habeas corpus. The court stated that its "discussion of the claims will track the petitioner's posttrial brief and will be limited to only those claims briefed by the petitioner." Specifically, the court addressed, inter alia, the petitioner's contentions that "counsel failed to properly investigate [Katsnelson's] report and testimony" and that "counsel failed to hire and utilize a forensic pathologist or medical examiner to challenge [Katsnelson's] conclusions." The court found that "[the petitioner] has failed to prove both the deficient performance and prejudice prongs" of his ineffective assistance of counsel claims.

The petitioner filed a petition for certification to appeal wherein he stated nine grounds on which he proposed to appeal. Relevant to this appeal[9] are the following grounds: "(1) [w]hether the trial court erred by ruling that the petitioner's expert was 'not . . . credible,' instead of applying the correct standard under *Lapointe* v. *Commissioner of Correction*, [316 Conn. 225, 112 A.3d 1 (2015)], that is, whether the petitioner's expert was of sufficient import and credibility that the petitioner is entitled to a new trial at which a jury will evaluate that testimony . . . (3) [w]hether a jury reasonably could credit the petitioner's expert's testimony . . . (4) [w]hether there was strong reason that the jury might well have found the testimony of the petitioner's expert persuasive, considering the expert's unquestioned qualifications and experience . . . (5) [w]hether the testimony of the petitioner's expert is sufficient, if credited, to call into question the outcome of the petitioner's criminal trial . . . (6) [w]hether the testimony of the petitioner's expert and the other evidence presented raises a reasonable probability that the result of the proceedings would have been different

---

[9] The petitioner did not brief in this appeal three of the grounds raised in his petition for certification to appeal.

. . . [and] (7) [w]hether the evidence raises a probability sufficient to undermine the confidence in the outcome of the trial . . . ."

Thereafter, on February 14, 2023, the habeas court issued an order on the petition for certification to appeal, stating in relevant part that "the petition for certification to appeal is denied as to the grounds indicated in [inter alia, ground one] . . . because [that ground is] not debatable among jurists of reason, able to be resolved in a different manner, or deserving of encouragement to proceed further. . . . The court grants the petition for certification to appeal as to grounds (3) through (7), which all individually and collectively seek to challenge this court's prejudice determination." (Citations omitted.) This appeal followed.

I

We begin with the petitioner's claim that the habeas court improperly rejected his claim that his right to the effective assistance of counsel was violated when Rozwaski failed to present the expert testimony of a forensic pathologist during his first habeas trial in support of the claim that Ghiroli had provided ineffective assistance of counsel during his criminal trial.[10] With

[10] "It is axiomatic that courts may decide against a petitioner on either prong [of the test set forth in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], whichever is easier. . . . [T]he petitioner's failure to prove either [the performance prong or the prejudice prong] is fatal to a habeas petition. . . . [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [petitioner] as a result of the *alleged* deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (Emphasis added; internal quotation marks omitted.) *Delgado* v. *Commissioner of Correction*, 224 Conn. App. 283, 291–92, 311 A.3d 740, cert. denied, 349 Conn. 902,    A.3d    (2024). Moreover, "[i]t is well established that [a] court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if it is easier to dispose of the claim on the ground of insufficient prejudice." (Internal quotation marks omitted.) *Grant* v. *Commissioner of Correction*, 342 Conn. 771, 783–84, 272 A.3d 189 (2022). Thus, because we conclude that the habeas court properly

respect to the prejudice prong, the petitioner contends that the court improperly determined that he failed to show that he was prejudiced by Ghiroli's and Rozwaski's decisions not to present a forensic pathology expert to provide testimony similar to that of Wecht.[11] The petitioner maintains that "[a]n objective review of the state's case against the petitioner reveals that [the petitioner's] scientific expert evidence would raise more than a reasonable probability that the result of the proceeding would have been different if it had it been presented at the criminal trial."[12] The respondent

determined that the petitioner had failed to establish prejudice, we need not address the performance prong.

[11] As noted previously in this opinion, the habeas court granted certification to appeal as to the petitioner's grounds challenging the court's determination that the petitioner had failed to demonstrate prejudice.

[12] The petitioner claims that "[t]he trial court erred because a jury reasonably could credit the petitioner's scientific expert evidence, which proves the petitioner's innocence by clear and convincing evidence and raises more than a reasonable probability that the result of the proceedings would have been different but for prior counsel's failure to present the evidence." The respondent argues, inter alia, that, had Wecht testified at the petitioner's criminal trial, such testimony would not have proved the petitioner's innocence because the jury instead would have weighed Wecht's testimony with the totality of the evidence that had been presented. In support of this contention, the respondent relies on *Summerville* v. *Warden*, 229 Conn. 397, 641 A.2d 1356 (1994), for the proposition that the testimony of a petitioner's new expert is "nothing more than a[n] [additional] expert opinion derived from an interpretation of the underlying autopsy data that [other experts] ha[ve] already interpreted." Id., 437. Our Supreme Court in *Summerville* also stated that a petitioner's new expert testimony "is not the kind of evidence that renders prior expert opinions . . . scientifically impossible or improbable. Indeed, if it were, [t]he ultimate result would be a never-ending battle of [pathologists] appointed [or retained] as experts for the sole purpose of discrediting a prior [pathologist's] diagnosis." (Internal quotation marks omitted.) Id. Wecht's testimony at the petitioner's habeas trial would not have satisfied the clear and convincing standard because his testimony did not unquestionably establish the petitioner's innocence and was, at most, contradictory to, and offered to discredit a portion of, the state's evidence at the underlying criminal trial. See *Ross* v. *Commissioner of Correction*, 217 Conn. App. 286, 305–306, 288 A.3d 1055, cert. denied, 346 Conn. 915, 290 A.3d 374 (2023); *Myers* v. *Commissioner of Correction*, 215 Conn. App. 592, 616–17, 284 A.3d 309 (2022), cert. denied, 346 Conn. 1021, 293 A.3d 897 (2023), and cert. denied sub nom. *Myers* v. *State*, 346 Conn. 1021, 293 A.3d

disagrees and argues that the petitioner has failed to prove prejudice because he has not shown a reasonable probability that the outcome of the petitioner's criminal trial would have changed had the jury heard testimony similar to that of Wecht. We agree with the respondent.

The following procedural history is relevant to our resolution of this claim. In its memorandum of decision, the habeas court stated in relevant part: "[The petitioner] has argued that the expert testimony of [Wecht], combined with his testimony . . . would establish the prejudice prong of [*Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. [The petitioner] argues that . . . [Wecht's] testimony that the gunshot was fired from a distance of at least greater than two feet supports his testimony that another person, at least eight feet away fired the fatal shot. . . .

"[The petitioner] however chooses to ignore the remaining evidence in the state's case. There were multiple witnesses to the argument and ongoing feud between him and the victim. Identification was not an issue, as all parties knew each other. There were two eyewitnesses who remained on the scene and gave statements to the police identifying [the petitioner] as the shooter and placing him standing right next to the victim when he was shot. There were no witnesses to [the petitioner's] third and fourth individuals. . . .

"In short, [the petitioner] has failed to demonstrate that there is a reasonabl[e] probability that the outcome of the criminal trial would have been different had . . . [Wecht] . . . testified. The state had abundant evidence, motive, and forensic testimony to support its case against [the petitioner]. [Wecht's] testimony fails to show not only the necessary performance prong, but also the prejudice prong. The state's evidence against

897 (2023). Accordingly, the petitioner did not meet the high burden of proof necessary to sustain a claim of actual innocence.

[the petitioner] was overwhelming and his claims against trial counsel must fail.

"In addition, any of [the petitioner's] claims as against habeas counsel must fail by the same reasoning. [The petitioner's] posttrial brief ignores the testimony of [Carver] and submits that the testimon[y] of . . . [Wecht] . . . [is] sufficient to undermine the confidence in the outcome of the habeas trial. [First habeas] counsel did in fact offer expert medical testimony from a more than qualified witness. His testimony was consistent with [that of Katsnelson] and other state's witnesses. [Wecht's] testimony at best challenged [the] nature of the injury and was inconsistent with eyewitness testimony, but did nothing to overcome the state's evidence and undermine this court's confidence in the outcome of the jury trial."

Our standard of review and the relevant legal principles on ineffective assistance of counsel claims are well settled. "A criminal defendant's right to the effective assistance of counsel extends through the first appeal of right and is guaranteed by the sixth and fourteenth amendments to the United States constitution and by article first, § 8, of the Connecticut constitution. . . .[13] To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, [supra, 466 U.S. 687]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . .

---

[13] "[T]he state and federal constitutional standards for review of ineffective assistance of counsel claims are identical and the rights afforded are essentially coextensive in nature and, thus, do not require separate analysis." (Internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, 197 Conn. App. 822, 830 n.8, 234 A.3d 78 (2020), aff'd, 341 Conn. 279, 267 A.3d 120 (2021).

by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Citation omitted; footnote in original; internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, 197 Conn. App. 822, 829–30, 234 A.3d 78 (2020), aff'd, 341 Conn. 279, 267 A.3d 120 (2021).

"An evaluation of the prejudice prong involves a consideration of whether there is a reasonable probability that, absent the errors, the [fact finder] would have had a reasonable doubt respecting guilt. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . We do not conduct this inquiry in a vacuum, rather, we must consider the totality of the evidence before the judge or jury. . . . Further, we are required to undertake an objective review of the nature and strength of the state's case. . . . As our Supreme Court [has explained], [s]ome errors will have had pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. . . . [A] court making the prejudice inquiry must ask if the [petitioner] has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . .

"In other words, [i]n assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, *Strickland* asks whether it is reasonably likely the result would have been different. . . . The likelihood of a different result must be substantial, not

just conceivable. . . . Notably, the petitioner must meet this burden not by use of speculation but by demonstrable realities." (Citations omitted; internal quotation marks omitted.) *Madera* v. *Commissioner of Correction*, 221 Conn. App. 546, 555–56, 302 A.3d 910, cert. denied, 348 Conn. 928, 305 A.3d 265 (2023).

"Our Supreme Court, in *Lozada* v. *Warden*, [223 Conn. 834, 843, 613 A.2d 818 (1992)], established that habeas corpus is an appropriate remedy for the ineffective assistance of appointed habeas counsel, authorizing . . . a second petition for a writ of habeas corpus . . . challenging the performance of counsel in litigating an initial petition for a writ of habeas corpus . . . [that] had claimed ineffective assistance of counsel at the petitioner's underlying criminal trial or on direct appeal. . . . [T]he court in *Lozada* also emphasized that a petitioner asserting a habeas on a habeas faces the herculean task . . . of proving in accordance with [*Strickland*] both (1) that his appointed habeas counsel was ineffective, and (2) that his trial counsel was ineffective. . . .

"Simply put, a petitioner cannot succeed . . . on a claim that his habeas counsel was ineffective by failing to raise a claim against trial counsel or prior habeas counsel in a prior habeas action unless the petitioner ultimately will be able to demonstrate that the claim against trial or prior habeas counsel would have had a reasonable probability of success if raised." (Citations omitted; internal quotation marks omitted.) *Crocker* v. *Commissioner of Correction*, 220 Conn. App. 567, 585–86, 300 A.3d 607, cert. denied, 348 Conn. 911, 303 A.3d 10 (2023).

We now turn to the merits of the petitioner's claim, recognizing that the claimed ineffective assistance regarding his first habeas counsel, Rozwaski, must fail if the claim of ineffective assistance of his trial counsel,

Ghiroli, is without merit. See *Lebron* v. *Commissioner of Correction*, 204 Conn. App. 44, 50, 250 A.3d 44, cert. denied, 336 Conn. 948, 250 A.3d 695 (2021). For the reasons that follow, we conclude that the habeas court properly determined that the petitioner has failed to satisfy the prejudice prong of *Strickland*. Specifically, the petitioner has failed to show that, had Ghiroli presented testimony similar to that of Wecht during the petitioner's criminal trial, there exists a reasonable probability that the outcome of that proceeding would have been different.

In the present case, the habeas court determined that Wecht's testimony did not undermine the state's "abundant evidence, motive, and forensic testimony to support its case against [the petitioner]." The court characterized the state's evidence against the petitioner as "overwhelming," and emphasized evidence of the "multiple witnesses to the argument and ongoing feud between [the petitioner] and the victim," and the "two eyewitnesses who remained on the scene and gave statements to the police identifying [the petitioner] as the shooter and placing him standing right next to the victim when he was shot." We agree with the court that the state presented overwhelming evidence against the petitioner. This court has, on two prior occasions, recognized the strength of the state's case against the petitioner. First, in the petitioner's direct appeal following his criminal trial, this court stated that "the evidence against the [petitioner] was overwhelming." *State* v. *Hilton*, supra, 79 Conn. App. 168. Subsequently, in the petitioner's appeal following his first habeas trial, this court observed that "the petitioner failed to carry his burden of demonstrating that there is a reasonable probability that the outcome of the trial would have been different had he been more prepared, given the strong and overwhelming evidence presented by the state."

*Hilton* v. *Commissioner of Correction*, supra, 161 Conn. App. 76.

Additionally, the habeas court determined that Wecht's testimony did not undermine confidence in the outcome of the petitioner's criminal trial because the petitioner's first habeas counsel, Rozwaski, presented the testimony of Carver, which was "consistent with [that of Katsnelson] and other state's witnesses." At the petitioner's first habeas trial, Carver addressed Katsnelson's conclusion that the victim suffered a contact wound and testified that, had he looked at the autopsy report without the corresponding photographs, then a "contact wound would be on the short list of explanations but would not be the only one." When asked, however, whether Katsnelson's conclusion that the victim suffered from a contact shot was proper, Carver responded, "I believe that there's sufficient evidence here between the photographs and the written record to make that diagnosis, yes." Carver also discussed the abnormality of the shape of the wound by testifying that "the major basis for my diagnosis that it was a contact wound [is] the fact [that] part of th[e] edge of the hole doesn't have an abrasion. . . . That would indicate that the forces that created that part of the hole came from inside, not from the outside. And the only way to do that would be the gasses from a contact wound." The habeas court determined that, on the basis of Carver's earlier testimony, the petitioner had failed to sustain his burden of proving prejudice because the testimony of Wecht was insufficient "to undermine . . . confidence in the outcome of the habeas trial. [Rozwaski] did in fact offer expert medical testimony from a more than qualified witness. His testimony was consistent with [that of Katsnelson] and other state's witnesses. [Wecht's] testimony at best challenged [the] nature of the injury and was inconsistent with eyewitness testimony, but did nothing to overcome the state's

evidence and undermine this court's confidence in the outcome of the jury trial."[14] Accordingly, on the basis of the record before us, including the overwhelming evidence the state presented against the petitioner, we conclude that the petitioner has failed to demonstrate a reasonable probability that the outcome of the criminal trial would have been different had Ghiroli presented expert testimony from a forensic pathologist, such as Wecht.

In sum, we conclude that the habeas court correctly determined that the petitioner had failed to sustain his burden of establishing prejudice under *Strickland* as to Ghiroli's decision not to present expert testimony and, therefore, the petitioner's claim of ineffective assistance of counsel against Rozwaski necessarily fails. We, therefore, conclude that the court properly denied the petitioner's petition for a writ of habeas corpus on this claim.

## II

The petitioner next claims that the habeas court abused its discretion in denying him certification to appeal with respect to his claim that the court applied the wrong legal standard in finding Wecht not credible. He contends that the court should have used the standard set forth by our Supreme Court in *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 225. We conclude that *Lapointe* is inapplicable to the present case and that the court's finding that Wecht was not credible is not clearly erroneous.

---

[14] Rozwaski also presented the testimony of DeForest on the petitioner's behalf. DeForest testified that, pursuant to his review of Katsnelson's autopsy report and photographs, the wound "[s]uperficially . . . could resemble a contact wound." When asked to render an opinion as to what type of gunshot wound the victim suffered, DeForest testified: "The—that I can't reach a conclusion. That it's—it's ambiguous," and could have resulted from either a long distance or a contact gunshot. As a result, DeForest testified that he could not conclude, to a reasonable degree of scientific certainty, that the victim had not sustained a contact gunshot wound.

"The following legal principles are relevant to our resolution of the petitioner's claim. General Statutes § 52-470 (g) provides: No appeal from the judgment rendered in a habeas corpus proceeding brought by or on behalf of a person who has been convicted of a crime in order to obtain such person's release may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried or, if such judge is unavailable, a judge of the Superior Court designated by the Chief Court Administrator, to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies.

"Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [a] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and applicable legal principles. . . . If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying [claim] to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive [claim] for the purpose of ascertaining whether [that claim satisfies] one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas

court's denial of the petition for certification." (Internal quotation marks omitted.) *Glen S.* v. *Commissioner of Correction*, 223 Conn. App. 152, 158–59, 307 A.3d 951, cert. denied, 348 Conn. 951, 308 A.3d 1038 (2024).

For the reasons set forth in part III of this opinion, we conclude that the petitioner has failed to demonstrate that his claim is debatable among jurists of reason, that a court could resolve the issue in a different manner, or that the question is adequate to deserve encouragement to proceed further. Thus, we conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal on this ground.

### III

The petitioner's substantive claim on appeal, relying on *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 225, is that the habeas court applied the wrong legal standard in assessing witness credibility. Specifically, the "[p]etitioner's argument is that the trial court erred when it made an assessment of who it thought was 'more credible' . . . without determining, as a matter of law, if a reasonable jury could credit the petitioner's scientific expert evidence—which it could." (Citation omitted; emphasis omitted.) The respondent disagrees and asserts, inter alia, that *Lapointe* is inapplicable in the present case because of its "explicit limitation on its exception to [the] general rule of deference to a fact finder's credibility assessment." We agree with the respondent.

The following additional procedural history is relevant to our resolution of this claim. In its memorandum of decision, the habeas court stated: "The primary focus of [the petitioner's] claims is the autopsy and the conclusions reached by [Katsnelson], in particular the distance that the deadly shot was fired from. This issue has now been litigated in the criminal trial and both habeas trials.

The jury and two separate habeas courts have heard from a total of four experts: [Katsnelson]; [DeForest]; [Carver]; and [Wecht]. [The petitioner] now posits that [Wecht's] conclusions and testimony prove his innocence. This court does not agree."

Specifically, the court determined that "[t]hree of the four experts found that there were indicia of a contact wound. Only [Wecht] completely ruled out the possibility of a contact wound. The court does not find [Wecht's] assessment to be credible, especially because he did not review [Carver's] testimony from the first habeas trial. [Carver] observed a stellate tear and evidence of a blowback laceration. Additionally, [Wecht] did not provide any explanation for the causes of the oval wound. Nor did [Wecht's] evaluation address the potential effects of the victim['s] being kept alive for a day or more so that organs could be harvested from his cleaned and disinfected body, the blood from the wound washing away gunshot residue, or the beginnings of the healing process making residue in the wound difficult to detect. The more credible evidence establishes that the shot that killed the victim was a contact shot.

"Because the court does not find [Wecht's] conclusion that the shot could not have been fired from less than twenty-four inches to be credible, [the petitioner's] claims premised thereon must fail."

As noted previously, the habeas court denied the petitioner certification to appeal as to his claim that the legal standard used by the court to assess witness credibility was erroneous. In denying certification to appeal on this ground, the court stated that it found "Wecht's conclusion that the shot could not have been fired from less than twenty-four inches to be not credible. The court did not find [Wecht] credible based on the totality of all evidence from the criminal, prior

habeas, and current habeas trials. [Wecht] did not review all relevant evidence, and his opinion was contradicted by the factual findings regarding the shape of the wound, stellate tearing, and evidence of a blowback laceration. It is this lack of foundation supporting [Wecht's] conclusion about the shot distance that caused the court to find him not credible as an expert witness.

"Contrary to the petitioner's argument in the petition for certification to appeal, *Lapointe* v. *Commissioner of Correction*, [supra, 316 Conn. 225], does not preclude a habeas court from determining that an expert witness and their conclusion are not credible. Nor does *Lapointe* establish a standard that a petitioner is entitled to a new trial by presenting an expert who is of sufficient import and credibility. Such a vague standard could necessitate a new criminal trial in nearly all post-conviction habeas proceedings involving expert witnesses. A habeas court's credibility assessments and how they impact the prejudice prong of the ineffective assistance of counsel standard would be rendered meaningless if a habeas court had to grant a new trial upon the presentation of expert testimony that was of sufficient import and credibility." (Emphasis omitted; internal quotation marks omitted.) Accordingly, the court denied the first ground of the petition for certification to appeal on the ground that it is "not debatable among jurists of reason, able to be resolved in a different manner, or deserving of encouragement to proceed further."

In addition to our well settled standard of review on ineffective assistance of counsel claims set forth in part I of this opinion, the following additional legal principles are relevant to our resolution of this claim. "The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given their testimony. . . . Questions of whether to believe

or to disbelieve a competent witness are beyond our review." (Internal quotation marks omitted.) *Fields* v. *Commissioner of Correction*, 179 Conn. App. 567, 575, 180 A.3d 638 (2018). "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Thus, [t]his court does not retry the case or evaluate the credibility of the witnesses." (Internal quotation marks omitted.) *Necaise* v. *Commissioner of Correction*, 112 Conn. App. 817, 825, 964 A.2d 562, cert. denied, 292 Conn. 911, 973 A.2d 660 (2009).

On appeal, the petitioner argues that we should deviate from these principles in light of our Supreme Court's decision in *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 225. We disagree.

In *Lapointe*, our Supreme Court "granted the respondent's petition for certification to appeal, limited to the following issue: 'Did the Appellate Court properly determine that the [petitioner's] first habeas counsel was ineffective for failing to pursue a claim that the state had suppressed evidence in violation of *Brady* v. *Maryland*, [373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)],' " and "answer[ed] the certified question in the affirmative because the testimony of the petitioner's experts was more than sufficient to call into question the reliability of the petitioner's conviction. Indeed, even if that expert testimony only tended to support the petitioner's claim that he could not have murdered the victim, *in view of the tenuous nature of the state's case against the petitioner—based as it was on his suspect admissions*—the state's *Brady* violation would warrant a new trial because, as the United States Supreme Court has recognized, exculpatory evidence of even 'minor importance' may well be 'sufficient to create a reasonable doubt' when, as in the present case, 'the [guilty] verdict is already of questionable validity . . . .' *United States* v. *Agurs*, 427 U.S. 97, 113, 96 S.

Ct. 2392, 49 L. Ed. 2d 342 (1976). Accordingly, [our Supreme Court] affirm[ed] the judgment of the Appellate Court reversing in part the judgment of the third habeas court and ordering a new trial." (Emphasis added.) *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 234.

The present case is both factually and legally distinguishable from *Lapointe*. As set forth in part I of this opinion, this court twice has identified the state's evidence against the petitioner as "overwhelming"; *Hilton* v. *Commissioner of Correction*, supra, 161 Conn. App. 76; *State* v. *Hilton*, supra, 79 Conn. App. 168; whereas our Supreme Court in *Lapointe* stated that its conclusion took "due account of the fact that the state's case against the petitioner was relatively weak, founded as it was on highly questionable admissions." *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 261. Thus, because we agree that the state presented overwhelming evidence against the petitioner, the petitioner's appeal is factually distinguishable from *Lapointe*.

Next, the petitioner's legal argument is different from that raised in *Lapointe*. In the present case, the petitioner challenges the habeas court's finding that Wecht was not credible. The court determined, in light of finding Wecht not credible, that the petitioner had failed to establish that the outcome of his criminal trial would have been different had a jury heard Wecht's testimony. Accordingly, the court concluded that the decisions of Ghiroli and Rozwaski not to present the expert testimony of a forensic pathologist did not constitute ineffective assistance of counsel. In contrast, the petitioner in *Lapointe* argued that prior counsel "rendered ineffective assistance in failing to demonstrate that the state withheld certain exculpatory evidence prior to trial in violation of *Brady* . . . ." Id., 229. This distinction is significant. In *Lapointe*, our Supreme Court determined that, "for purposes of the present case, which involves

the suppression of exculpatory evidence by the state, our task is not to determine whether the jury more likely than not *would* have credited [the] testimony [of the petitioner's witnesses], such that the petitioner *would* have prevailed at a new trial. . . . The question, rather, is whether the jury reasonably *could* have credited the testimony of the petitioner's witnesses." (Citation omitted; emphasis in original.) Id., 293–94. In other words, the court stated that, "[i]n such circumstances, when the habeas court's assessment of the expert testimony has nothing to do with the personal credibility of the expert witness but instead is based entirely on the court's evaluation of the foundational soundness of the witness' professional opinion, this court is as well situated as the habeas court to assess that testimony for *Brady* purposes." Id., 269.

Our Supreme Court explained its reasoning for limiting an appellate court's evaluation of the credibility of an expert witness specifically to *Brady* claims as follows: "Our conclusion in this regard is limited to the kind of fact-finding that is implicated in the *Brady* context. In cases involving claims under *Brady*, the function of the habeas court is to determine whether the evidence withheld by the state is sufficiently credible that a jury reasonably could credit it and, if so, whether the evidence also is sufficiently pertinent to an issue in the case that it reasonably could lead to a different result. This predictive evaluation of the evidence is different from the ordinary case, in which the fact finder is responsible for the ultimate assessment of credibility. Thus, as the Pennsylvania Supreme Court recently explained, '[a]ssessing credibility for purposes of [*Brady*] prejudice is not necessarily the same thing as assessing credibility at a trial.' *Commonwealth* v. *Johnson*, 600 Pa. 329, 359, 966 A.2d 523 (2009)." *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 272 n.42. The court further stated that,

"[b]ecause, in addressing a claim under *Brady*, a habeas court's credibility determination is not an 'absolute' finding, as the factual findings of the ultimate finder of fact are, but merely is a threshold evidentiary assessment required for the purpose of determining whether the ultimate finder of fact reasonably could credit the evidence, the principle that reviewing courts typically defer to credibility findings in the *Brady* context has its sole basis in the fact that the habeas court is ordinarily in a better position to judge credibility, and is not based on the general prohibition against appellate fact-finding. Consequently, when this court is in as good a position as the habeas court to assess credibility for the purpose of reviewing a claim under *Brady*, reviewing the habeas court's credibility assessment de novo does not place this court in the improper role of finding ultimate facts but merely allows this court to carry out its proper role of determining the legal question of materiality under *Brady*." Id.

A petitioner's claim of ineffective assistance of counsel outside of the *Brady* context is, therefore, treated differently from a petitioner's claim implicating *Brady*. With respect to the former, this court has articulated a "well settled standard of review governing challenges to a habeas court's judgment on ineffective assistance of counsel claims. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . . In a habeas trial, the court is the trier of fact and, thus, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony . . . . It is simply not the role of this court on appeal to second-guess credibility determinations made by the habeas court."

(Internal quotation marks omitted.) *Delgado* v. *Commissioner of Correction*, 224 Conn. App. 283, 290–91, 311 A.3d 740, cert. denied, 349 Conn. 902,    A.3d (2024).

In the present case, both the petitioner's principal appellate brief and reply brief set forth scant argument as to why this court should apply *Lapointe* to his claim on appeal. Significantly, the petitioner does not (1) address our Supreme Court's limitation of *Lapointe* to *Brady* claims, (2) attempt to reconcile the factual dissimilarities between his claims on appeal and *Lapointe*, or (3) provide argument as to why this court should read *Lapointe* beyond the Supreme Court's language to apply its reasoning to his ineffective assistance of counsel claim. Accordingly, we will not deviate from our well settled rule that "[i]t is simply not the role of this court on appeal to second-guess credibility determinations made by the habeas court." (Internal quotation marks omitted.) *Fields* v. *Commissioner of Correction*, supra, 179 Conn. App. 569. Therefore, on the basis of the record before us, we conclude that the present case is not governed by *Lapointe*. Accordingly, we will not disturb the habeas court's finding that Wecht was not credible. See *Perez* v. *Commissioner of Correction*, 194 Conn. App. 239, 243, 220 A.3d 901 ("[t]he issue of credibility is not debatable among jurists of reason and, thus, cannot be used to overturn the decision of a habeas court" (internal quotation marks omitted)), cert. denied, 334 Conn. 910, 221 A.3d 43 (2019).

The judgment is affirmed with respect to the petitioner's claim of ineffective assistance of counsel; the appeal is dismissed as to the petitioner's remaining claim.

In this opinion the other judges concurred.